UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

DENISE CARBONE,

**MEMORANDUM & ORDER**

**08-CV-2376 (NGG)**

Plaintiff,

-against-

MICHAEL J. ASTRUE, Commissioner of
Social Security,

Defendant.
------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Denise Carbone ("Carbone") brings this action against Defendant Michael

Astrue, Commissioner of the Social Security Administration (the "Commissioner") under 42

U.S.C. § 405(g) seeking judicial review of the Commissioner's order denying her October 5,

2005 application for Disability Insurance Benefits. (Compl. (Docket Entry #1) 1-4.) The

Commissioner moves for judgment on the pleadings affirming his decision. (Def. Motion

(Docket Entry #14) 1-2.) Carbone cross-moves for judgment on the pleadings, seeking to

remand the case solely to calculate benefits. (Pl. Motion (Docket Entry #10) 1; Pl. Memo.

(Docket Entry #11) 23.) For the following reasons, the Commissioner's motion is denied and

Carbone's motion is granted in part.

**I. BACKGROUND**

**A. Procedural History**

Carbone claims that she has been disabled by a seizure disorder since June 18, 1999.

(Administrative Transcript ("Tr.") (Docket Entry #9) 72-73.) On October 5, 2005, she applied

for Title II Social Security Benefits; her last insured date was December 31, 2004. (Tr. 70.) On

May 12, 2006, a Social Security Administration ("SSA") medical examiner determined that she was not disabled. (Tr. 65.) On July 5, 2006, Carbone challenged that determination and requested a hearing before an ALJ. (Tr. 60.)

On August 23, 2007, Administrative Law Judge Jay L. Cohen (the "ALJ") held a hearing at which both Carbone and a court-appointed medical expert, Dr. Warren Cohen ("Dr. Cohen"), testified.[1] (Tr. 226-76.) On November 6, 2007, the ALJ determined that Carbone was disabled within the meaning of the Social Security Act from June 18, 1999 through May 1, 2004, but that as of May 2, 2004 her condition had improved such that she was no longer disabled. (Tr. 27-28.)

On December 10, 2007, Carbone appealed the ALJ's determination to the SSA Office of Hearings and Appeals, contesting the finding that she was no longer disabled as of May 2, 2004. (Tr. 14, 16.) On April 25, 2008, the SSA denied her request for review. (Tr. 3.) Carbone filed this action on June 13, 2008. (Compl. 1-4.)

**B. Carbone's Medical History**

Carbone was born on September 26, 1967 and is currently 42 years old. (Tr. 70.) She was originally diagnosed with generalized seizure disorder at the age of 15 by a childhood physician.[2] (Tr. 119.)

1. Pre-May 2, 2004

Carbone's treating physician, Dr. Itzhak Haimovic ("Dr. Haimovic"), practices at Neurological Specialties of Long Island along with several other physicians, including Dr. Irwin Schlesinger ("Dr. Schlesinger"). (See, e.g., Tr. 151, 159.) Dr. Haimovic first examined Carbone

---

[1] Dr. Warren testified in accordance with his contract with the SSA. (Tr. 43.) The ALJ requested that he appear and give testimony as a medical expert, and instructed him that his testimony would primarily cover Carbone's condition from June 18, 1999 through December 31, 2004. (Id.)

[2] According to Dr. Cohen, primary generalized disorder is type of epilepsy where the "electrical abnormality starts deep down in the deep centers of the brain and spreads equally to all parts of the brain." (Tr. 259-60.) "An individual that has a generalized seizure usually loses responsiveness. [He or she] will . . . become limp and fall to the ground." (Tr. 261.)

on September 9, 1998. (Tr. 119.) At that meeting, Carbone indicated that she had been free of generalized seizures for the previous eight years, but suffered from approximately 10-20 small seizures per month. (Id.) She described the seizures as brief moments of a jerk without definite confusion, disorientation, or weakness of her arms or legs. (Id.) Her medications included 250 mg of Depakote four times per day. (Id.) A neurological examination yielded normal results. (Id.)

A follow-up electroencephalogram ("EEG") performed by Dr. Haimovic on September 12, 1998 showed, inter alia, a single burst of four per second, small spike and wave activity in a generalized distribution lasting approximately one and a half seconds. (Tr. 118.) Dr. Haimovic indicated that the test results were consistent with primary generalized seizure disorder. (Id.) In a note dated March 29, 1999, Dr. Haimovic wrote that Carbone complained of recurrent bouts of disorientation. (Tr. 115.) He increased her Depakote prescription to 500 mg three times per day. (Id.)

Another EEG performed by Dr. Haimovic on January 31, 2001 revealed, inter alia, multiple bursts of three to four per second generalized spike and wave, lasting one to two seconds, with frontal predominance. (Tr. 110.) Dr. Haimovic wrote that the EEG results were consistent with primary generalized seizure disorder, but did not show any evidence of focal abnormalities. (Id.) Dr. Haimovic's note from the same date states that Carbone had been experiencing an increased number of seizures and complained of a headache. (Tr. 112.) He increased her Depakote prescription to 500 mg three times per day and instructed her not to drive.[3] (Id.) A medical report from Dr. Haimovic dated February 15, 2001 stated that Carbone experienced a seizure in January 2001 and fell to the floor. (Tr. 109.) The report stated that she

---

[3] It appears that Carbone was already taking 1,500 mg of Depakote per day; it is not clear why Dr. Haimovic referred to this as an increase.

then had headaches for the rest of the week and that she experienced increased absence seizures "after the week of dropping to floor." (Id.) Dr. Haimovic increased her Depakote prescription from 1,500 to 2,000 mg per day. (Id.)

Dr. Haimovic examined Carbone again approximately a year later on February 14, 2002. (Tr. 107-08.) Carbone complained of approximately 15 bouts of absence seizures per day and indicated that she was taking 750 mg of Depakote twice per day without significant relief.[4] (Tr. 107.) She reported that on one occasion she fell and injured herself. (Id.) A neurological examination yielded normal results. (Tr. 107-08.) Dr. Haimovic's diagnosis was poorly controlled absence seizures and generalized seizures well-controlled by Depakote. (Tr. 108.) He added 250 mg twice daily of Zarontin to her drug regiment. (Id.)

On March 8, 2002, Carbone visited Drs. Haimovic and Schlesinger's office, but the record does not indicate which physician examined her.[5] (Tr. 105-06.) The report states that Carbone complained of a severe and constant occipital headache, described as "someone hammering in the head." (Tr. 105.) At the time, she was prescribed 750 mg of Depakote two times per day and 500 mg of Zarontin daily. (Id.) A neurological examination yielded normal results. (Tr. 106.) The diagnosis was that her seizure condition was stable but that her headaches had worsened. (Id.) On March 29, 2002, Dr. Haimovic performed an EEG, which yielded normal results. (Tr. 104.)

A March 18, 2004 report from Drs. Haimovic and Schlesinger's office states that Carbone experienced three bouts of generalized seizures and numerous absence seizures, and

---

[4] According to Dr. Cohen, an absence seizure is "another form of staring spell type of seizure that sometimes can look like petit mal seizures, and it arises from one particular location in the brain, that is the temporal lobe." (Tr. 269.) He defined petit mal seizures as "spells that are associated with very brief loss of responsiveness usually seen as just a staring spell. And it lasts usually for several seconds and then immediately afterwards the individual resumes [his or her] usual level of activity and responsiveness. [He or she doesn't] fall to the ground [or] have any shaking . . . ." (Tr. 260.)

[5] The signature pages on some documents in the administrative record contain the names of multiple physicians.

that her then-current medication was 1,000 mg of Depakote twice daily. (Tr. 123.) A neurological examination yielded normal results. (Tr. 124.) Nonetheless, the examining physician gave a diagnosis of poorly controlled absence and generalized seizures, and increased her Depakote prescription to 2,500 mg per day. (Id.) The report does not specify which doctor conducted the examination. (Id.) Another EEG performed by Dr. Haimovic on April 17, 2004 was normal. (Tr. 122.)

### 2. Post-May 1, 2004

A 24-hour EEG performed by Dr. Haimovic on May 4, 2004 supports varying conclusions from different doctors. Dr. Haimovic wrote in his EEG report:

> [t]he 24 hour sampling recorded revealed on at least two occasions, a single bout of spike and wave activity lasting less than 1 second. Throughout the recording there were no bouts of prolonged 3 per second spike and wave activity noted. Each spike and wave bout lasted less than 1 second.

(Tr. 150.) He concluded: "[a]lthough the patient indicated at least 2 bouts of petit mal, and series of petit mal, these were not accompanied by electroencephalographic activity. Clinical correlation is indicated." (Id.) In a letter dated August 1, 2007, Dr. Haimovic wrote: "[a] 24-hour EEG was performed [in May 2004] and revealed at least two bouts of absence-type seizures." (Tr. 151.) In a report regarding a July 6, 2006 office visit, Dr. Schlesinger wrote: "[a] 24-hour EEG monitor in May of 2004 showed two bouts of clinical petit mal, which were not accompanied by EEG activity." (Tr. 158) (emphasis in original).)

But at the August 23, 2007 hearing, Dr. Cohen interpreted the results as normal and testified that the test showed that what Carbone was "describing as petit mal seizures . . . did not occur and were not actually seizures." (Tr. 270.) In his decision, the ALJ did not acknowledge the differences between the various reports or explicitly indicate whether he found that the EEG test itself revealed seizures or whether Carbone incorrectly perceived the seizures. He wrote:

5

[a] 24 hour EEG monitor done in May 2004 showed two bouts of clinical petit mal which were not accompanied by EEG activity. A more recent 72 hour EEG monitor (December 2005) was interpreted as being normal. The results of these tests raised some doubts as to the existence of a seizure disorder.

(Tr. 25) (citations to record omitted).)

On November 28, 2005, Dr. Sunil Mehra submitted a "Disability Determinations" form regarding Carbone's condition. (Tr. 98-103.) He indicated that Carbone had no exertional restrictions for lifting and carrying, standing and walking, sitting, or pushing and pulling. (Id.) But he also indicated that he could not provide a medical opinion regarding her ability to perform work-related activities. (Id.)

On a November 30, 2005 Disability Determination form, Dr. Haimovic wrote that Carbone suffered from seizures, headaches, and migraines, as well as disorientation and confusion. (Tr. 129.) He did not, however, answer questions regarding Carbone's exertional limitations or her ability to engage in work-related physical activities. (Tr. 130-35.) A December 5, 2005 report from Dr. Haimovic stated that Carbone complained of more than 21 petit mal seizures per week, and that there had been no change in the condition of her petit mal seizures. (Tr. 168-69.) A neurological examination yielded normal results. (Tr. 169.) At the time, she was prescribed to Depakote and Ativan. (Tr. 168.) Between December 16 and 18, 2005, Dr. Haimovic performed a 72-hour ambulatory EEG on Carbone. (Tr. 166-67.) He wrote that the results were normal and that there was no evidence of electroencephalographic or electroclinical epileptogenic activity. (Tr. 167.)

On February 27, 2006, Carbone visited Dr. Schlesinger. (Tr. 160.) In his report, Dr. Schlesinger wrote: "patient states that she has absence, atonic, and generalized" seizures. (Id.) Carbone had experienced a seizure in January 2006, at which time she was prescribed Keppra in addition to her 3,000 mg per day prescription of Depakote; she reported that the Keppra

significantly decreased the frequency of her seizure activity. (Id.) A neurological examination revealed no abnormalities. (Id.)

On July 6, 2006, Carbone again visited Dr. Schlesinger. (Tr. 158.) In the report regarding this visit, Dr. Schlesinger stated that, according to Carbone, her seizures were fairly well-controlled by 1,500 mg of Depakote taken twice daily. (Id.) Her most recent seizure had been in January of that year, at which point Keppra had been added to her drug regiment. (Id.) However, Carbone stated that she could not tolerate the Keppra and eventually discontinued it. (Id.) Dr. Schlesinger's report noted the May 4, 2004 24-hour EEG and the December 2005 72-hour EEG, writing: "[b]ased on these two studies, there was what appeared to be some doubt as to the existence of a seizure disorder. However, the patient is quite definitive that she has both atonic and myoclonic seizures and that her current medication holds them at bay." (Id.) He concluded that Carbone had "seizure disorder by history" and advised her to continue taking 3,000 mg of Depakote daily. (Id.)

A few weeks later, on July 28, 2006, Dr. Schlesinger wrote: "Ms. Carbone has been diagnosed with generalized seizure disorder." (Tr. 145.) He wrote that Carbone had suffered from as many as 15 bouts of seizures per day and that between 1999 and 2004 she was unable to work because of their frequency. (Id.) Dr. Schlesinger concluded that, because "[h]er seizures are generalized and are not preceded by an aura . . . she cannot anticipate the seizures and take appropriate action for her safety and well being."[6] (Id.)

The record also contains a medical report from November 27, 2006; however, there is no information regarding the author. (Tr. 157.) The report states that Carbone has a known seizure

[6] An aura is a "peculiar premonitory (foreboding) sensation experienced by some epileptic patients before the onset of an attack. It occurs in about 50 percent of the cases and consists of visual and hearing disturbances, as the sight of sparks or bright colors, or the smelling of something burning." 1 Attorney's Dictionary of Medicine and Word Finder A-614 (2009).

disorder; that her most recent seizure had been a week before and that she had experienced several petit mal seizures since her last visit; that she does not drive; that she has poor short term memory; and that one year earlier she had fallen and hit the floor. (Id.) The report states that Carbone was prescribed 3,000 mg of Depakote daily and that the negative side effects that she experienced from Keppra included difficulty getting out of bed, increased sleeping day and night, inability to function, and weight gain. (Id.)

On August 1, 2007, Dr. Haimovic sent a letter to Carbone's attorney summarizing Carbone's treatment history. (Tr. 151-52.) He noted, inter alia, that her January 2001 EEG "revealed evidence of 3 per second spike and wave activity." (Tr. 151.) He stated that Carbone has a "poorly controlled seizure disorder on Depakote, Zarontin, and Keppra, as well as intractable headaches. Her seizures are unpredictable and cause her to drop, become confused and disoriented." (Tr. 152.) Dr. Haimovic concluded that "because of her intractable seizure disorder, she is incapable of being gainfully employed at this time." (Id.)

On August 22, 2007, Dr. Haimovic submitted an Impairment Questionnaire to Carbone's attorney. (Tr. 194-99.) He indicated that Carbone was receiving treatment twice per year, that she suffered from seizures 10 to 25 times weekly, and that her three most recent seizures had occurred on August 7, August 8, and August 10, 2007. (Tr. 194-95.) He further indicated that the seizures typically occurred in the morning and were often precipitated by stressful situations or too much activity going on around her; that Carbone cannot work at heights and cannot operate a motor vehicle; that she can tolerate low work stress; that she would need to break to rest at unpredictable intervals during an eight-hour workday depending on the amount of seizure activity; that Carbone would miss work more than three times per month as a result of her

impairments; that she would need to avoid noise at work; and that travel to and from work could present problems because of her inability to anticipate seizures. (Tr. 195-98.)

a.   <u>Carbone's Testimony at the August 23, 2007 Hearing</u>

At the August 23, 2007 hearing, Carbone testified that she had not experienced a grand mal seizure since 1990. (Tr. 237.) From 1990 through 1999, she suffered from petit mal seizures about once a month. (Tr. 246.) After the birth of her daughter in 1999, the seizures increased to about three to four per day. (Tr. 236, 245.) Describing the seizures, she testified: "[m]y legs would go completely -- I wouldn't have any muscle control in my legs. . . . So I would drop to the floor." (Tr. 236.)

According to Carbone, she cannot work because she has no way of anticipating when a seizure will occur, and is therefore unable to provide for her own safety. (Tr. 237.) Carbone testified that her seizures have occurred with the same frequency since 2001, but because she began sustaining injuries she believes that her seizures have become more severe. (Tr. 237-38.) She testified that she fell to the floor and hit her head in 2001, (Tr. 237), and that she sustained second degree burns after a seizure caused her to spill coffee on her right leg in 2006, (Tr. 239).[7] Other than that incident, she has not gone to the emergency room because of a seizure since she stopped suffering from grand mal seizures in 1990. (Tr. 240.) Carbone sees Dr. Haimovic every six months to a year depending on when she can get an appointment. (Tr. 238-39.)

Carbone testified that her daily activities include cooking, cleaning the house, shopping, watching TV, doing Sudoku puzzles, helping her children with their homework, visiting relatives with her family, and occasionally taking her daughter to the park. (Tr. 241-42.) She "absolutely [does] not" drive and only takes public transportation when she must. (<u>Id.</u>) She testified that after a seizure she generally feels normal. (Tr. 242.)

---

[7] (Tr. 216-19 (reports from hospital emergency department).)

9

Carbone currently takes only Depakote for her seizure disorder. (Tr. 239.) At one point she tried Zarontin, but she stopped because the side effects were painful and she derived no benefit from it. (Tr. 243.) She also tried Ativan for about two weeks, but that left her too "sleepy." (Id.) After the incident in 2006 when she burned her leg, she was prescribed Keppra, but discontinued use because of side effects: "I had absolutely no quality of life whatsoever. Sleeping constantly, no memory, I gained a great deal of weight over that course of time because my life was sleeping." (Id.)

Carbone currently claims to experience several side effects from using Depakote. (Tr. 244.) She has tremors in both hands. (Id.) Her eyes "kind of dart back and forth," making it difficult to read and often making her feel dizzy. (Id.) The Depakote also makes her tired and forces her to take regular naps. (Id.) She testified that the length of time she naps varies, from 15 minutes to three hours per nap, and that she sometimes has to take three or four per day. (Tr. 246.)

### b.    Dr. Cohen's Testimony at the August 23, 2007 Hearing

Dr. Cohen testified that there is "no doubt" that Carbone suffers from primary generalized seizure disorder and that the question is the frequency of her seizures. (Tr. 270-71.) He also testifed that epilepsy "typically waxes and wanes through the course of an individual's lifetime. . . . [I]n some individuals it can go into complete remission." (Tr. 250-51.) He noted that the record lacks medical documents regarding several time periods. (Tr. 248-49.) There are no treatment records from 2000 or 2003, and only one from 2001. (Tr. 248.) He further testified that in some of the medical records the number of seizures Carbone suffered from was not quantified; Dr. Haimovic stated after the February 15, 2001 visit that Carbone suffered from an increased number of seizures and a report from 2004 stated that Carbone suffered from

10

"numerous episodes of . . . seizures," but those statements were not further characterized, (Tr. 248-49).[8]

Dr. Cohen testified that the May 2004 EEG was the only test that addressed Carbone's petit mal seizures. (Tr. 249.)[9] He testified that, although Carbone perceived seizures, the EEG showed "no abnormality" and the results "refuted the validity of the episodes . . . being seizures in origin." (Tr. 249, 260.) When asked why a person may perceive a seizure when he or she has not actually had one, he responded that it is "usually attributed to something that's emotional in basis." (Tr. 272.) He testified that, because Carbone's perceptions "were not actually seizures[,]" there is no way to know how many of the seizures she claims to have suffered are real and how many are not. (Tr. 270-71.) For that reason, Dr. Cohen testified that it is difficult to quantify the seizures and therefore difficult to conclude what effect Carbone's seizure disorder has on her ability to work. (Tr. 271-72.) The ALJ asked Dr. Cohen whether it would be prudent to perform another 24-hour EEG or a different test. (Tr. 272.) Dr. Cohen replied that, because he thought the May 2004 24-hour EEG was "very helpful[,]" a repeated test was probably not needed. (Id.)

Dr. Cohen expanded upon the distinction between petit mal and primary generalized seizures. (Tr. 258-62.) He first explained their clinical symptoms and characteristic EEG results. (Id.) In an EEG, petit mal epilepsy is demonstrated by three per second spikes in waves. (Tr. 260.) Clinically, it has "certain very characteristic features[,]" one of which is spells that are associated with very brief losses of responsiveness, usually just seen as a staring spell. (Id.) "[I]t usually lasts for several seconds and then immediately afterwards the individual resumes their usual level of activity and responsiveness. They don't fall to the ground." (Id.) "Petit mal

---

[8] (Tr. 109 (February 15, 2001 medical report); Tr. 123 (March 18, 2004 medical report).)

[9] (Tr. 150 (May 4, 2004 EEG results).)

seizures are usually associated with no . . . physical change that would be noticeable to people around a person, other than the fact that they might stare or might lose their train of thought. . . . There may be some very mild movements, but usually, they're not noticeable." (Tr. 261-62.)

According to Dr. Cohen, primary generalized seizures are a separate issue. (Tr. 259.) In an EEG, primary generalized seizures show a "three to four per second generalized spike in wave abnormality." (Tr. 258.) Clinically, "[a]n individual that has a generalized seizure usually [loses] responsiveness. They will . . . become limp and fall to the ground as the claimant described in some of her episodes. . . . That's different [from] a petit mal seizure." (Tr. 261.)

Dr. Cohen specifically disagreed with the portion of Dr. Haimovic's August 1, 2007 letter which stated that the January 31, 2001 EEG "demonstrated three per second spike in wave activity." (Tr. 258.)[10] He referred to the initial EEG report, which stated that the EEG had revealed evidence of three to four per second spike and wave activity. (Id.) "It may sound to be nitpicking, but from a neurologic perspective, there is a difference between three to four per second and three per second." (Id.) "The EEGs don't show a three per second spike in wave." (Tr. 260.) He therefore concluded that the medical evidence in the record supported a diagnosis of primary generalized seizure disorder.

> [Generalized seizure disorder is] consistent with the testimony that the claimant described about the major seizures that she has experienced, including a seizure in which she fell to the ground that she described. That would be typical of a generalized seizure and that would be consistent with the EEG that was performed in 2001.

(Tr. 262.)

Dr. Cohen also addressed some of Carbone's nonexertional limitations. He testified that both a seizure disorder itself or Depakote could cause sleepiness; and that if Carbone's sleepiness

---

[10] (See Tr. 110 (initial EEG report); Tr. 151 (Dr. Haimovic's letter).)

is a side effect of Depakote, that would usually be addressed by attempting to have her use other medication. (Tr. 250.) He also testified that headaches are a separate issue, and although they can occur as a result of seizures, he did not see anything in the record to suggest a correlation between the Carbone's seizures and Carbone's headaches. (Tr. 262-63.)

Dr. Cohen opined that from January 2002 through June 2002, the severity of Carbone's condition equaled the listing in § 11.03.[11] (Tr. 263-64.) However, because of the lack of continuous treatment during other periods and the May 2004 EEG findings, he opined that Carbone did not meet the listing requirements outside of that period. (Tr. 249.) Dr. Cohen further opined that Carbone's impairments limit her from working at heights, driving, being exposed to hazards, and using dangerous equipment, but that "[t]here would be no other limitations." (Tr. 250.) Regarding Dr. Schlesinger's statement that Carbone cannot work, Dr. Cohen testified that he did not disagree with the premise, but "just [came] to the conclusion that the medical record does not support . . . what [Dr. Schlesinger] states" regarding Carbone's ability to work. (Tr. 256-57.)

### C. Carbone's Work History

In June 1986, Carbone finished one year of college. (Tr. 79.) She has never received any special job, trade, or vocational training. (Tr. 79-80.) The longest position she held was as a Customer Service Representative from 1995 through 1999. (Tr. 74.) Her responsibilities included opening new accounts, closing installment accounts, helping people balance checkbooks, placing stop payments, and similar activities. (Id.) She was not required to use machines, tools, or equipment. (Id.) She describes the daily exertional requirements for the

---

[11] Epilepsy under § 11.03 is defined as: "nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. Pt. 404, Subpt. P, App. 1

position as 30 minutes of walking; 30 minutes of standing; six hours of sitting; six hours of handling, grabbing, or grasping big objects; and six hours of writing, typing, or handling small objects. (Id.) The position required no heavy lifting or carrying. (Id.) Carbone also held positions as a Customer Service Representative from 1986 to 1987, Sales Assistant from 1987 to 1988, and Service Specialist from 1988 to 1990. (Tr. 74.) These positions did not require any significant exertion beyond that required for the Customer Service position. (Tr. 83, 85, 86.)

### D. The ALJ's Decision

On November 6, 2007, the ALJ found that Carbone was disabled from June 18, 1999 through May 1, 2004, but that her condition had improved such that as of May 2, 2004 she was no longer disabled. (Tr. 17-19, 21-31.) Specifically, the ALJ found that Carbone's disorder equaled the requirements of the listed impairment under § 11.03 of the regulation from January 2002 through June 2002. (Tr. 27.) For the periods June 18, 1999 through December 2001 and July 2002 through May 1, 2004, the ALJ found that Carbone had a Residual Functional Capacity ("RFC") below the requisite for sedentary work. (Tr. 27-30.)

The first three steps of the ALJ's analysis are uncontested. At step one, he found that Carbone had not engaged in substantial gainful activity since the alleged onset date. (Tr. 24.) At step two, he summarized Carbone's medical history and found that she suffered from medically determinable severe impairments. (Tr. 24-27.) At step three, the ALJ found that Carbone's seizure disorder met the listing requirements for epilepsy under § 11.03 from January 2002 through June 2002. (Tr. 27.)

Regarding Carbone's RFC, the ALJ first determined that from June 18, 1999 through May 1, 2004, Carbone's RFC was less than the full range of sedentary work:

14

the claimant was suffering from chronic and frequent petit mal seizures on a daily basis. These were accompanied by severe occipital headaches. On one occasion the claimant fell and injured herself, requiring hospital emergency room treatment. Her medications produced adverse side effects, and one had to be discontinued because the claimant could not tolerate it.

(Tr. 27-28.) The ALJ concluded that from June 18, 1999 through May 1, 2004, Carbone could not sit, stand, or walk for six hours in an eight hour day, and that because of the nature of her seizures and the side effects of her medication, she could not sufficiently attend to or concentrate on work related tasks. (Id.)

As of May 2, 2004, the ALJ concluded that "medical improvement had clearly occurred." (Tr. 28.)

The claimant's seizures were less frequent. She was seeing her physicians far less often. She became much more active on a daily basis. Whereas in March 2004 the claimant's seizure disorder was characterized by disorientation and confusion, EEG testing performed on April 29, 2004 produced normal results. Subsequent EEG monitoring raised doubts as to the existence of a seizure disorder. Results obtained on neurological evaluation included normal sensation and coordination, normal gait and station, and full motor power. Dr. Mehra found in November 2005 that the claimant had no functional restrictions. In 2006, Dr. Schlesinger stated that the claimant's seizure disorder was being well controlled through the use of medication (Depakote).

(Tr. 28) (citations to the record omitted).) The ALJ concluded that Carbone's RFC had increased to the point that she was capable of performing light work activity – that she could sit, stand and walk for up to six hours in an eight hour day, lift or carry as many as 20 pounds, and attend and concentrate on work tasks without difficulty. (Id.)

In considering Carbone's credibility regarding the limiting effects of pain and other symptoms not corroborated by medical evidence, the ALJ found that Carbone's medically determinable impairments could reasonably be expected to produce the claimed symptoms. (Tr. 28-29.) He also found that Carbone's assertions of disability regarding her condition before May 2, 2004 were generally proportionate to and consistent with the medical record.

15

> [H]er medications have produced adverse side effects, in particular fatigue. The claimant was unable to tolerate one of her medications, Keppra, and it had to be discontinued. The claimant was required to limit her daily activities. In particular she had to give up operating a motor vehicle. Traveling was also problematic due to the nature of her illness. She could not anticipate when a seizure might occur, and therefore could not make [adequate] plans in the event a seizure event occurred.

(Id.)

However, the ALJ concluded that Carbone's testimony regarding the intensity, persistence, and limiting effects of her condition from May 2, 2004 onward was not credible.

> The more recent medical evidence, however, shows a marked decrease in the frequency of her seizures and improved findings on diagnostic testing, in particular EEG. Further, in hearing testimony the claimant admitted that she is currently reasonably active in terms of her daily living activities. She performs ordinary chores such as cooking, cleaning, and shopping without assistance. She looks after her children, and she can engage in some forms of recreational activities.

(Id.)

The ALJ discussed the treating physician rule and reasoned that Dr. Haimovic's opinion could be not be granted controlling or great weight.

> There is a demonstrated decrease in the frequency and intensity of her seizure events, and a corresponding decline in the frequency of her interactions with her physicians. Diagnostic test results proved negative. So also were the results of neurological evaluations. . . . The claimant also testified that her daily living activities are quite substantial, a fact that is contrary to Dr. Haimovic's statement that she is disabled. For these reasons, [Dr. Haimovic's] opinion cannot be granted great or controlling weight.

(Tr. 30.)

Reasoning in the alternative at the fifth step, the ALJ found that even if Carbone were not capable of returning to her prior position, her RFC qualified her for other jobs in the national economy. (Tr. 30-31.) The ALJ stated that Carbone is a younger person, has one year of college education, can communicate in English, and has acquired work skills from her past relevant

work. (Tr. 30.) Considering these factors, along with Carbone's RFC, the ALJ concluded that

Carbone was disabled under the Medical-Vocational Guidelines framework until May 1, 2004.

(Tr. 31.) The ALJ found that, as of May 2, 2004, "with a functional capacity for the full range of

light work, a finding of 'not disabled' is reached by direct application of Medical-Vocational

Rule 202.22." (Tr. 32.)

## II. DISCUSSION

### A. Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not

disabled only if the factual findings are not supported by 'substantial evidence' or if the decision

is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. §

405(g)). "Substantial evidence means more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v.

Astrue, 569 F.3d 108, 112 (2d Cir. 2009). Nonetheless, "it is up to the agency, and not [the]

court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d

115, 118 (2d Cir. 1998).

### B. Disability Standards

The SSA has established a five-step sequential analysis to determine whether a claimant

is disabled. See 20 C.F.R. § 404.1520(a). If at any step the ALJ finds the claimant disabled or

not disabled, the ALJ does not continue to the next step of the analysis. 20 C.F.R. §

404.1520(a)(4). At the first step, the ALJ determines whether the claimant is engaged in

substantial gainful activity. 20 C.F.R. § 404.1520(a)(i). If the claimant is engaged in substantial

gainful activity, he or she is not disabled. Id. At the second step, the ALJ considers the medical

severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(ii). A claimant who lacks a

severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement, will be found not disabled. Id. At the third step, the ALJ determines whether the claimant's impairments meet or equal one of the listings in appendix 1 of the regulation; if they do, the claimant will be found disabled. 20 C.F.R. § 404.1520(a)(iii); see 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ considers whether the claimant's RFC permits the claimant to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(iv). RFC is defined as the most a person can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). If the claimant can perform past relevant work, he or she is not disabled. 20 C.F.R. § 404.1520(a)(iv). At the fifth step, the ALJ considers the claimant's RFC along with the claimant's age, education, and work experience to determine if he or she can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(v). If the claimant can adjust to other work, he or she is not disabled. Id. If the claimant cannot make the adjustment to other work, he or she is disabled. Id. The claimant bears the burden of proof through the first four steps of the analysis; the Commissioner bears the burden at the fifth step. Shaw, 221 F.3d at 132.

The ALJ is required to consider "all evidence" in the record. 20 C.F.R. § 404.1520(a)(3). Failure to properly consider all the record evidence is legal error and grounds for remand. See Sutherland v. Barnhart, 322 F. Supp. 2d 282, 290 (E.D.N.Y. 2004) ("the ALJ's failure to mention several parts of the record which contradict his conclusion constitutes error.").

A claimant's RFC should be based on "all of the relevant medical and other evidence," including restrictions on physical, mental, and other abilities. 20 C.F.R. § 404.1545(a)(3); 20 C.F.R. § 404.1545(b)-(d); accord SSR 96-8p, 1996 WL 374184, *5 (July 2, 1996) ("[t]he RFC assessment must address both the remaining exertional and nonexertional capacities of the

individual."). The ALJ should consider "any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations." 20 C.F.R. § 404.1545(a)(3). Furthermore, the ALJ must consider the aggregate effects of all impairments, even those that are not by themselves severe. 20 C.F.R. § 404.1545(e).

### C. The Treating Physician Rule

The treating physician rule requires an ALJ to give controlling weight to the opinion of a claimant's treating physician regarding the nature and severity of an impairment, so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). When an ALJ does not afford controlling weight to a treating physician's medical opinion, he or she must consider several factors to determine how much weight to give it. Id. These factors include: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the opinion is from a specialist; and (5) other factors brought to the SSA's attention that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d).

Although these factors must be substantively applied; failure to expressly consider them does not necessarily result in a remand. See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (affirming Commissioner's decision when it was unclear if the ALJ was even aware of the applicability of the treating physician rule, but "the ALJ applied the substance of the treating physician rule"). Nonetheless, an ALJ must still "always give good reasons" for the weight he or she assigns to a treating source's opinion. 20 C.F.R. § 416.927(d)(2). Failure to do so is ground

for remand. Halloran, 362 F.3d at 33 ("[the court does] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion.").

Additionally, if evidence from a treating physician is inadequate to make a determination, the ALJ has an affirmative duty to develop the record. 20 C.F.R. § 404.1512(e); 20 C.F.R. § 404.1512(e)(1) ("[the SSA] will seek additional evidence or clarification from [a claimant's] medical source when the report from [the] medical source contains a conflict or ambiguity that must be resolved [or] does not contain all the necessary information . . . ."); see also Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). Furthermore, the ALJ's duty to seek additional information is not limited to treating physicians; the duty exists whenever evidence from a "treating physician or . . . other medical source is inadequate" to determine whether a claimant is disabled. 20 C.F.R. § 404.1512(e)(1).

However, the ultimate conclusion of whether a person is disabled is reserved to the Commissioner; a statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that he or she is necessarily disabled. 20 C.F.R. § 404.1527(e)(1). "[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

### D. Claimant Credibility

The ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010). The regulations provide a two-step process to determine a claimant's credibility. 20 C.F.R. § 404.1529(b). First,

the ALJ must consider whether medical signs and laboratory findings show the existence of a medical impairment which "could reasonably be expected to produce the pain or other symptoms alleged." Id. If the statements about pain or other symptoms are not supported by medical signs or laboratory findings, they cannot alone establish that a claimant is disabled. 20 C.F.R. § 404.1529(a). If the evidence does support the existence of such a condition, the ALJ must proceed to the second step and evaluate the "intensity and persistence" of the claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(c). At this second step, the ALJ must consider both objective medical evidence as well as other evidence that may suggest a "greater severity of impairment than can be shown by objective medical evidence alone." 20 C.F.R. § 404.1529(c)(3). The ALJ must consider, inter alia, a claimant's statements regarding the "intensity, persistence, and limiting effects" of symptoms "in relation to the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). When determining a claimant's credibility, the ALJ's reasoning must be "set forth with sufficient specificity to permit intelligible plenary review of the record." Williams o/b/o Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988).

### E. Medical Improvement Standard

Once a claimant establishes the existence of a disabling condition, the medical improvement standard shifts the burden of proof to the Commissioner; a claimant is entitled to a presumption that the classification will not change unless the condition, governing statutes, or regulations change. De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 937 (2d Cir. 1984); see also Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002) ("[u]nder the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled."). Where a claimant has already demonstrated a past disabling condition, the

ALJ must determine whether the condition has improved, and if so, whether that improvement is relevant to the claimant's work capacity. 20 C.F.R. § 404.1594(a). Even where such improvement is related to the claimant's ability to work, the Commissioner must also show that the claimant is able to engage in substantial gainful activity. 20 C.F.R. § 404.1594(b)(3). Medical improvement is defined as any decrease in the medical severity of a claimant's impairment which was present at the time of the most recent favorable medical decision that he or she was disabled or continues to be disabled. 20 C.F.R. § 404.1594(b)(1). A determination that there has been a decrease in medical severity must be based on improvement in the symptoms, signs, or laboratory findings associated with a claimant's impairments. Id.

Generally, the medical improvement standard under 20 C.F.R. § 404.1594 is applied at a continuing disability review regarding a prior adjudication. See, e.g., Veino v. Barnhart, 312 F.3d 578 (2d Cir. 2002). But several circuits have held that the standard is also appropriate for closed period cases.[12] See Waters, 276 F.3d at 719; Shepherd v. Apfel, 184 F.3d 1196, 1200 (10th Cir 1999); Pickett v. Bowen, 833 F.2d 288, 292-93 (11th Cir. 1987); Chrupcala v. Heckler, 829 F.2d 1269, 1274 (3d Cir. 1987); see also Jones v. Shalala, 10 F.3d 522 (7th Cir. 1993) (applying the medical improvement standard to a closed period of disability.); Hall v. Chater, No. 94-CV-1401 (FB), 1996 WL 118544 (E.D.N.Y. Mar. 8, 1996).[13] The Second Circuit has not yet addressed whether the standard also applies to closed period cases. In Chavis v. Astrue, No. 07-CV-0018, 2010 WL 624039, at *5 (N.D.N.Y. Feb. 18, 2010), the district court applied the

[12] A closed period of disability refers to when a claimant is "found to be disabled for a finite period of time which started and stopped prior to the date of the administrative decision granting disability status." Alan G. Skutt, Annotation, Social Security: Applicability of Medical-Improvement Standard in Determining Continuing Eligibility for Disability Benefits to "Closed Period" Beneficiaries, 93 A.L.R. Fed. 161 (1989).

[13] The Eighth Circuit applied the medical improvement standard to a closed period of disability in Burress v. Apfel, 141 F.3d 875, 879 (8th Cir. 1998). That decision, however, did not specifically address two earlier Eighth Circuit decisions holding that the medical improvement standard did not apply to closed period cases. See Ness v. Sullivan, 904 F.2d 432, 435 n.4 (8th Cir. 1990); Camp v. Heckler, 780 F.2d 721, 721-22 (8th Cir. 1986).

medical improvement standard to a closed period of disability after finding that, although there is no precedent in the Second Circuit, the "overwhelming [majority]" of circuit courts that have addressed this question have held that the medical improvement standard is applicable. Neither party in this case contests that the medical improvement standard governs. The court follows the other circuits that have addressed this issue.

The ALJ must assess medical improvement in relation to the "most recent favorable medical decision[,]" which is defined as "the latest decision involving a consideration of the medical evidence and the issue of whether [a claimant was] disabled or continued to be disabled which became final." 20 C.F.R. § 404.1594(b)(7). Some courts have used the onset date of the disability as the appropriate point of comparison in closed period disability cases.[14] Other courts have used a broader timeframe as the point of comparison.[15]

In this case, the ALJ divided Carbone's closed period of disability into three sub-periods: (1) when her RFC was below the sedentary level from June 18, 1999 through January 2002; (2) when her condition met a listed impairment from January 2002 through June 2002; and (3) when her RFC was again below the sedentary level from June 2002 through May 1, 2004. (Tr. 27.) The most recent favorable medical decision could, in this case, feasibly be the onset date of the closed period or the onset date of any of the sub-periods.

As noted above, the record lacks information regarding Carbone's condition for much of the time during the disability period. Additionally, the record does not indicate at which point

---

[14] See, e.g., Pickett, 833 F.2d at 291-92 ("[t]he ALJ first determined that the claimant was under a disability in [the onset date of the closed period]. . . . Consequently . . . the ALJ [must] examine whether the claimant has experienced medical improvement since [the onset date of the closed period]."); Shepherd, 184 F.3d at 1201-02.

[15] See, e.g., Niemasz v. Barnhart, 155 Fed.Appx. 836, 840 (6th Cir. 2005) (holding that "[the ALJ] did apply the comparison that the standard requires" when "he referred to [the claimant's] conditions during the period of disability . . . "); Jones, 10 F.3d at 523 (noting several medical reports over the course of approximately a year in support of the conclusion that the claimant "had experienced medical improvement and was no longer disabled for purposes of the Act" as of the last date of the closed period).

within the disability period Carbone's condition was least severe. The court therefore considers the question of medical improvement holistically in relation to the entire period that the ALJ found Carbone disabled.

### F. Application

Because the ALJ's conclusions regarding Carbone's disability, her treating physician's opinion, and her credibility are supported by many of the same findings, the court addresses them together and then addresses the reasoning underlying each finding.

In support of his conclusion that Carbone had an RFC below the sedentary level before May 2, 2004, the ALJ found: (1) Carbone suffered from chronic and frequent petit mal seizures on a daily basis; (2) the seizures were accompanied by severe occipital headaches; (3) on one occasion Carbone fell and injured herself, requiring emergency room treatment; and (4) her medications produced adverse side effects, and one had to be discontinued because she could not tolerate it. (Tr. 27.)

In support of his conclusion that beginning May 2, 2004 Carbone's condition had improved, the ALJ found: (1) her seizures were less frequent; (2) she saw her physicians far less often; (3) she had become much more active on a daily basis; (4) EEG testing performed on April 29, 2004 produced normal results; (5) subsequent EEG testing raised doubts about the existence of a seizure disorder; (6) neurological evaluations were normal; (7) Dr. Mehra stated in November 2005 that Carbone had no functional restrictions; and (8) Dr. Schlesinger stated in 2006 that Carbone's seizure disorder was well-controlled through medication. (Tr. 28.) Based on these findings, the ALJ concluded Carbone's RFC had increased such that she could perform light work activity. (Id.)

The ALJ also noted several of these findings to explain why he did not afford controlling weight to Carbone's treating physician's opinion, including: (1) her seizures were less frequent and less intense; (2) there was a corresponding decline in the frequency of interactions with physicians; (3) diagnostic tests and neurological evaluations were negative; and (4) Carbone testified that her daily living activities were quite substantial. (Tr. 30.)

In support of his conclusion that Carbone's claims regarding her condition before May 2, 2004 were credible, the ALJ found: (1) her medications produced adverse side effects, including fatigue, and she had been forced to discontinue using Keppra; (2) she was required to limit her daily activities and, in particular, she had to give up operating a motor vehicle; (3) traveling was problematic because of the nature of her illness; and (4) she could not anticipate when a seizure might occur, and therefore could not adequately plan for the occurrence of a seizure. (Tr. 29.)

In support of his conclusion that Carbone's claims regarding her condition after May 2, 2004 were not credible, the ALJ found: (1) the medical evidence showed a marked decrease in the frequency of her seizures; (2) diagnostic test results, particularly from EEGs, had improved; and (3) she was reasonably active in terms of her daily living activities. (Id.)

### 1. The Frequency of Carbone's Seizures

The ALJ noted a decrease in Carbone's seizure activity in support of his conclusion regarding the dates of Carbone's disability, his decision not to afford controlling weight to Dr. Haimovic's opinion, and his conclusion that Carbone's testimony regarding her post-May 1, 2004 condition was not credible. But there is little information in the record regarding the number of seizures Carbone was experiencing and little support for the statement that there has been a significant decrease in their frequency. In September 1998, before the alleged onset period, Carbone complained of 10 to 20 seizures per month. (Tr. 119.) In February 2002, during

25

the period the ALJ found that Carbone's condition met the impairment listing, she suffered from 15 absence seizures per day. (Tr. 107.) In December 2005, she suffered from more than 21 petit mal seizures per week. (Tr. 168.) In August 2007, Dr. Haimovic wrote that Carbone suffered from an average of 10-25 seizures per week. (Tr. 195.) Aside from these dates, there is no information in the record regarding the number of seizures Carbone experienced. In particular, there is no information regarding the number of seizures Carbone experienced during the period from February 2002 through the end of the disability period in May 2004. Dr. Cohen noted this during the August 23, 2007 hearing, when he testified that medical records from 2001 and 2004 did not quantify the number of seizures Carbone experienced, (Tr. 248-49), and that it was difficult for him to quantify Carbone's seizures, (Tr. 271). Carbone, on the other hand, testified that the frequency of her seizures had remained constant since 2001. (Tr. 238.) The ALJ's statement that the evidence shows a "marked decrease" in the frequency of Carbone's seizures is, therefore, not supported by the evidence.

## 2. The Frequency of Carbone's Physician Visits

The ALJ noted a decrease in Carbone's visits to physicians in support of his conclusion that her medical condition had improved after May 1, 2004 and his decision not to afford controlling weight to Dr. Haimovic's opinion. This finding is also not supported by the record. In 1999, there were five documented medical visits, one or two of which were after the June 18, 1999 disability onset date.[16] (Tr. 113-17.) In 2000, there were no documented medical visits, a fact that Dr. Cohen brought to the ALJ's attention at the August 23, 2007 hearing. (Tr. 248.) For 2001, there are two medical reports in the record. (Tr. 109, 110.) In 2002, Carbone visited Dr. Haimovic three times. (Tr. 104-05, 107-08.) There were no medical reports from 2003 other than a blood level determination, a fact also noted by Dr. Cohen at the August 23, 2007 hearing.

---

[16] The date for one of the documents is partially cut off. (See Tr. 117.)

(Tr. 249.)[17] In 2004, there were three visits, two of which were before the May 2, 2004 improvement date and one which was after. (Tr. 122-24, 150.) In 2005, Carbone visited Dr. Haimovic twice. (Tr. 166-70.) And in 2006, Carbone visited Dr. Haimovic once, Dr. Schlesinger twice, and an unidentified physician once. (Tr. 157, 158, 160, 164.) The years with no documented medical visits – 2000 and 2003 – were during the period that the ALJ found Carbone to be disabled. The year with the most medical visits – four in 2006 – was during the period that the ALJ found Carbone was visiting her physicians less frequently. Furthermore, Dr. Haimovic stated that on August 10, 2007 that he treats Carbone twice per year, and Carbone testified at the August 23, 2007 hearing that she sees Dr. Haimovic every six months to a year. (Tr. 194, 239.)

### 3. Diagnostic Tests and Neurological Evaluations

The ALJ relied on normal diagnostic test results and neurological evaluations to support his conclusion regarding the improvement of Carbone's medical condition, the weight given to Dr. Haimovic's opinion, and Carbone's credibility. This is problematic for several reasons. First, the different interpretations of the May 4, 2004 EEG results are inconsistent. As discussed above, although Dr. Haimovic stated that the EEG "revealed at least two bouts of absence-type seizures[,]" but Dr. Cohen testified that they "were not actually seizures" and that "the EEG showed no abnormality." (Tr. 151, 260, 270.) The ALJ neither acknowledged nor resolved these discrepancies.

Furthermore, the ALJ did not explain why normal tests and neurological evaluations were dispositive regarding Carbone's disability as of May 2, 2004 but not before. There were two instances of normal EEGs during the period that the ALJ found Carbone to be disabled, March 29, 2002 and April 17, 2004. (Tr. 104, 122.) Similarly, all neurological evaluations in the record

---

[17] (Tr. 125 (blood level determination).)

were normal, including February 14, 2002, March 8, 2002, and March 18, 2004, which were all within the Carbone'a period of disability. (Tr. 106, 107, 124.)

Additionally, although Dr. Cohen stated that Dr. Haimovic misreported the results of the January 31, 2001 EEG in his August 1, 2007 letter, Dr. Cohen did not give a reason to exclude the possibility that the initial January 31, 2001 report was inaccurate, as opposed to the August 1, 2007 letter. The record does not contain primary test results from which Dr. Cohen based his conclusion. The ALJ should have sought to further develop the record by seeking clarification from the physician who personally conducted the test.

### 4. Dr. Mehra's report

The ALJ cited Dr. Mehra's report in support of his conclusion that Carbone's medical condition had improved. (Tr. 28.)[18] However, while Dr. Mehra stated that Carbone had no exertional limitations, he also indicated in his report that he could not "provide a medical opinion regarding this individual's ability to do work-related activities." (Tr. 103.) The ALJ did not mention this part of the report or inquire why Dr. Mehra could not offer that opinion. In light of Carbone's assertions of nonexertional limitations, including fatigue, difficulty reading, difficulty traveling, headaches, and fear for her safety, this gap in the record is significant.

### 5. Dr. Schlesinger's Statements

To support his conclusion that Carbone's condition had improved, the ALJ wrote that "[i]n 2006, Dr. Schlesinger stated that the claimant's seizure disorder was being well controlled through the use of medication." (Tr. 28.) The ALJ was referring to when Dr. Schlesinger wrote: "[a]ccording to the patient, her seizures are fairly well controlled on Depakote . . . ." (Tr. 158.) Because a similar statement exists in the record before May 2, 2004, Dr. Schlesinger's statement, without further explanation, does not support the ALJ's conclusion of medical improvement.

---

[18] (See Tr. 98-103 (Dr. Mehra's report).)

(See Tr. 108.) Furthermore, less than a month later, on July 28, 2006, Dr. Schlesinger wrote that Carbone had been diagnosed with generalized seizure disorder and "cannot anticipate the seizures and take appropriate action for her safety and well being." (Tr. 145.)

The ALJ did not specifically mention the July 28, 2006 report, though he was possibly referring to it when he wrote that Carbone "could not anticipate when a seizure might occur, and therefore could not make [adequate] plans in the event a seizure event occurred." (Tr. 29.) He made that statement, however, in support of his conclusion that Carbone's testimony regarding her condition before May 2, 2004 was credible. (Id.) The ALJ's analysis in this regard does not appear to be supported by the record; the two documents that contain such statements are both from after May 2, 2004 – Dr. Schlesinger's July 28, 2006 report and Dr. Haimovic's August 10, 2007 report. (See Tr. 145, 198.)

### 6. Carbone's Headaches

Although the ALJ cited Carbone's headaches only to support the conclusion that she was disabled before May 2, 2004, there is no evidence of improvement regarding this condition. As recently as August 1, 2007, Dr. Haimovic wrote that Carbone suffers from "intractable headaches." (Tr. 152.) Dr. Cohen only testified that Carbone's headaches were most likely unrelated to her seizure condition. (Tr. 262-63.) Neither Dr. Cohen's testimony nor anything else in the record contradicts Dr. Haimovic's statement or explains why Carbone's headaches were evidence of a disability before May 2, 2004 but not after.

### 7. Carbone's Incident Requiring Emergency Treatment

In support of his conclusion that Carbone was disabled before May 2, 2004, the ALJ stated that Carbone fell and injured herself, requiring emergency treatment.[19] (Tr. 27.) To the

---

[19] The ALJ was presumably referring to the 2001 incident when Carbone fell and hit her head. (Tr. 237.) It is not clear from the record whether her treatment following this incident is properly characterized as an injury requiring

contrary, Carbone testified that the only instance since 1990 when she was required to go to the emergency room because of a seizure was in 2006, when she spilled coffee on her leg and had to go to the hospital for second degree burns. (Tr. 239-40.) There is no explanation why the post-2004 incident does not support a conclusion of disabled but the pre-2004 incident would.

### 8. Medication Side Effects

The ALJ also referred to the side effects Carbone suffered from her medication as evidence supporting her disability and credibility before May 2, 2004. But Carbone still takes Depakote daily and still claims to experience many of the side effects that the ALJ acknowledged she suffered from until May 1, 2004.[20] (Tr. 151-52, 239.) Carbone testified that she experiences sleepiness and has to nap three to four times per day. (Tr. 246.) Dr. Cohen testified that either her seizure disorder or the Depakote medication could feasibly cause these side effects. (Tr. 250.) Furthermore, though the ALJ mentions Carbone's discontinuation of Keppra to support the conclusion that she was disabled before May 2, 2004, she was not prescribed Keppra until 2006. (Tr. 158, 160.) Again, there is no explanation for why these conditions support a finding a disability before May 2, 2004 but not after.

### 9. Carbone's Daily Activities

The ALJ relied on Carbone's daily activities to support his findings that her medical condition improved, to support his decision not to afford Dr. Haimovic's opinion controlling weight, and to explain why her testimony regarding her condition after May 1, 2004 was not credible. (Tr. 28-30.) Carbone testified that her activities include cooking, cleaning the house,

---

emergency treatment. According to Carbone's testimony, the treatment she received following that fall was an MRI to check for causes of her seizures, not emergency treatment related to the injury itself. (Id.) This appears to be supported by the record; Dr. Haimovic wrote that he scheduled the test to exclude the possibility of a lesion and the MRI report was dated several days later from a different office. (Tr. 111-12.)

[20] Carbone's most recent medical records, from 2006, show a Depakote prescription of 3,000 mg daily. (See Tr. 157, 158, 160.) Medical records from the period of disability show prescriptions of 1,500 to 2,500 mg daily. (See Tr. 105-06, 107, 109, 123-24.)

shopping, watching TV, doing Sudoku puzzles, helping her children with their homework, visiting relatives, and occasionally taking her daughter to the park. (Tr. 241-42.) But there is no evidence that Carbone "engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job." Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983). "[A] claimant need not be an invalid to be found disabled under Title XVI of the Social Security Act . . . ." Murdaugh v. Sec'y of Dept. of Health & Human Servs. of U.S., 837 F.2d 99, 102 (2d Cir. 1988) (holding that claimant who "waters his landlady's garden, occasionally visits friends and is able to get on and off an examination table" was nonetheless disabled and unable to perform a full range of sedentary work); see also Balsamo v. Chater, 142 F.3d 75, 78-79 (2d Cir. 1998) (finding that a claimant who periodically attended church, occasionally helped his wife with shopping, and operated a motor vehicle when required was disabled). Considering that Carbone's condition affects her intermittently and irregularly throughout the day, the activities that she testified about do not by themselves qualify as substantial evidence in support of the ALJ's decision.

### 10. Carbone's Ability to Drive and Travel

The ALJ stated that traveling was problematic for Carbone and that, "in particular she had to give up operating a motor vehicle[,]" to support his conclusion that her testimony regarding her pre-May 2, 2004 testimony was credible. (Tr. 29.) But there is no evidence that those circumstances have improved. At the August 23, 2007 hearing, Carbone testified that she "absolutely [does] not" operate a motor vehicle and that she only uses public transportation when forced to, (Tr. 241-42), and Dr. Cohen testified that Carbone's impairment limits her ability to participate in work activities that involve driving, (Tr. 250). Dr. Haimovic's August 10, 2007 Impairment Questionnaire supports Carbone's statements that traveling is still problematic.

(Tr.198.) Again, there is no explanation for why Carbone's travel restrictions supported her credibility before May 2, 2004 but not after.

### E. The ALJ's Step Five Analysis

Reasoning in the alternative, the ALJ found that even if Carbone were unable to perform past work, her RFC of light work was adequate for other employment. The Commissioner, relying on Bapp v. Bowen, 802 F.2d 601 (2d Cir. 1986), asserts that because Carbone's nonexertional limitations do not significantly limit her work capacity, the ALJ properly applied the medical-vocational guidelines. (Def. Memo. (Docket Entry #15) 20.) Because the ALJ did not properly apply the SSA analysis before the fifth step, the court is not required to address this issue. The court notes, however, that under Bapp the question of whether a nonexertional impairment significantly diminishes work capacity is a two-step process that requires separate analysis outside of the context of the larger question of whether a claimant is disabled. Bapp, 802 F.2d at 606 (finding that although the ALJ did find that the claimant's nonexertional impairments did not significantly diminish his range of work, the ALJ "did so in the context of the ultimate question, i.e., was [the claimant] disabled. The ALJ failed to consider the intermediate question-whether the range of work [the claimant] could perform was so significantly diminished.") In this case, the ALJ acknowledged that under the guidelines the grids are applied differently to exertional and nonexertional limitations, but introduced no such intermediate analysis of Carbone's nonexertional limitations. (Tr. 31.)

## III. CONCLUSION

For the foregoing reasons, the court finds that the ALJ's decision was not supported by substantial evidence. Defendant's motion is denied. Plaintiff's Motion is granted in part. The court remands this case to the Commissioner for further administrative proceedings consistent

with this opinion to determine whether Carbone's medical condition improved as of May 2, 2004.[21]

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      August 25, 2010

NICHOLAS G. GARAUFIS
United States District Judge

---

[21] On the last two pages of his opinion, the ALJ refers to Carbone's onset date as October 16, 1999 instead of June 18, 1999. (Tr. 30-31.) Both parties' briefs use June 18, 1999 as the onset date, and Carbone's brief expressly notes the discrepancy. (See, e.g., Pl. Memo. 1, 20; Def. Memo. 1, 21.) It appears to be a clerical error.